IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION


INTERSTATE BAKERIES CORPORATION, )
                                  )
                Plaintiff,        )
                                  )
v.                                )          Case No. 09-00809-CV-W-SWH
                                  )
ONEBEACON INSURANCE COMPANY,      )
                                  )
                                  )
                Defendant.        )


ORDER

I.  BACKGROUND

On October 2, 2009, plaintiff, Interstate Bakeries Corporation, ("IBC") filed a Complaint for

Declaratory Judgment against OneBeacon Insurance Company ("OneBeacon") seeking to establish

that OneBeacon has a duty to defend and pay IBC's defense costs in litigation pending in the United

States District Court for the Northern District of Georgia, Flowers Bakeries Brands, Inc. v. Interstate

Bakeries Corporation, Case No. 08-CV-2376.  (Complaint, doc #1)

On November 16, 2009, prior to any discovery having been conducted, IBC filed a motion

for partial summary judgment on the issue of OneBeacon's duty to defend.[1]  (Doc #19)  According

to IBC, it is one of the largest wholesale distributors of packaged breads and bakery products in the

United States.  (Doc #20 at 7)  At issue is Advertiser Advantage Policy No. MEP-2458-07 which

OneBeacon sold to the insured IBC for the period September 1, 2007 through September 1, 2008.

_____

[1]An expedited discovery and briefing schedule was established requiring all discovery to
be completed within sixty days with all briefing to be completed within 42 days from the close of
discovery.  (Doc #40)

A competitor of IBC, Flowers Bakeries Brands, Inc. ("Flowers"), alleges that IBC used the phrases "Nature's Pride" and "Nature's Choice" to advertise and promote IBC's bread products, thereby infringing Flowers' trademark "Nature's Own." IBC tendered the defense of the <u>Flowers</u> lawsuit to OneBeacon on February 13, 2009, seeking coverage for claims in the <u>Flowers</u> litigation. Coverage was denied on February 26, 2009.

Defendant opposes the motion for partial summary judgment on the basis that there is no possibility of coverage, that any possible coverage is precluded by various exclusions in the policy and that, at the very least, material facts are in dispute as to coverage as well as OneBeacon's affirmative defenses of late notice and failure to cooperate. (Doc #52)

## II. <u>SUMMARY JUDGMENT STANDARD</u>

A moving party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A party who moves for summary judgment bears the burden of showing that there is no genuine issue of material fact for trial. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986). However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." <u>Id.</u> at 247-48. "Material" facts are those "that might affect the outcome of the suit under the governing law," and a "genuine" material fact involves evidence "such that a reasonable jury could return a verdict for the nonmoving party." <u>Id.</u> at 248.

The initial burden of proof in a motion for summary judgment is placed on the moving party to establish the absence of any genuine issue of material fact. <u>See</u> <u>Olson v. Pennzoil Co.</u>, 943 F.2d

881, 883 (8ᵗʰ Cir.1991). If the moving party meets its initial burden, the nonmoving party must then produce specific evidence to demonstrate genuine issues for trial. Id. When the burden shifts, the nonmoving party may not rest on the allegations in its pleadings, but, by affidavit and other evidence, must set forth specific facts showing that a genuine issue of material fact exists. See Fed.R.Civ.P. 56(e); Stone Motor Co. v. General Motors Corp., 293 F.3d 456, 465 (8ᵗʰ Cir. 2002). When considering a motion for summary judgment, a court must scrutinize the evidence in the light most favorable to the nonmoving party and the nonmoving party "must be given the benefit of all reasonable inferences." Mirax Chem. Prods. Corp. v. First Interstate Commercial Corp., 950 F.2d 566, 569 (8ᵗʰ Cir. 1991).

The Court may not weigh the evidence in the record, decide credibility questions or determine the truth of factual issues, but merely decides if there is evidence creating a genuine issue for trial. See Bell v. Conopco, Inc., 186 F.3d 1099, 1101 (8ᵗʰ Cir. 1999).

## III. UNDISPUTED FACTS

The following facts are uncontroverted unless otherwise noted:

1. Plaintiff Hostess Brands, Inc., fka Interstate Bakeries Corporation, is a Delaware corporation with principal executive offices and headquarters located in Kansas City, Missouri, until June 1, 2009. They are now located in Irving, Texas. [Declaration of J. Randall Vance ("Vance Decl."), ¶ 2; IBC's Notice of Change of Name (Docket No. 13)] (Plaintiff's Uncontroverted Fact #1 (hereafter "PUF"))

2. Defendant OneBeacon Insurance Company is an insurance company organized in Pennsylvania with its principal place of business in Boston, Massachusetts. [IBC Complaint (Docket No. 1), ¶ 2 and OneBeacon Answer (Docket No. 17), ¶ 2] (PUF #2)

3. OneBeacon transacts insurance business in the State of Missouri. [IBC Complaint (Docket No. 1), ¶ 3 and OneBeacon Answer (Docket No. 17), ¶ 3] (PUF #3)

4. OneBeacon sold Advertiser Advantage Policy no. MEP-2458-07 to named insured IBC, with a policy term of September 1, 2007 through September 1, 2008. [Vance

Decl. ¶ 3 and Exhibit "1" (hereafter "Policy"), p. 1 declarations]  (PUF #4)

5.      OneBeacon issued the policy to IBC at its Kansas City, Missouri office, where IBC negotiated the terms of the policy.  [Vance Decl. ¶ 4 and Policy (declarations), p. 1] (PUF #5)

6.      Flowers Bakeries Brands, Inc. ("Flowers") filed suit against IBC on July 23, 2008 in litigation styled as *Flowers Bakeries Brands, Inc. v. Interstate Bakeries Corporation*, U.S.D.C., Northern District of Georgia, Case No. 1:08-CV-2376 ("the Flowers suit"). [Exhibit "2" (hereafter "Flowers' Complaint") and Vance Decl. ¶ 13] (PUF #15)[2]

7.      Flowers filed a first amended complaint against IBC in the *Flowers* suit on August 8, 2008.  [A copy of the First Amended Complaint in the *Flowers* suit is attached as Exhibit "3" (hereafter "Flowers' Amended Complaint") and Vance Decl. ¶ 14] (PUF #16)[3]

8.      Flowers filed a second supplemental complaint against IBC in the *Flowers* suit on November 17, 2008.  Flowers alleged causes of action for:  (1) Federal Trademark Infringement (under the Lanham Act); (2) Federal Unfair Competition (under Section 43(a) of the Lanham Act, i.e., 15 U.S.C. § 1125(a)); (3) State Trademark Dilution; (4) Common Law and State Unfair Competition; (5) Unfair and Deceptive Trade Practices.  [The Second Supplemental Complaint in the *Flowers* suit is attached as Exhibit "4" (hereafter "Flowers' Supplemental Complaint") and Vance Decl. ¶ 14].  (PUF #17)

9.      Flowers' Supplemental Complaint alleges that IBC's use of the phrases "Nature's Pride" and "Nature's Choice" to promote its bakery products infringed Flowers' trademark in "Nature's Own" and also constitutes various forms of unfair

---

[2]OneBeacon filed two motions asking the Court to take judicial notice of material from the Flowers litigation.  (See doc #51 and #64)  Plaintiff opposed the last request on the basis that it was untimely and the material referred to was not relevant to any issues in the case.  (Doc #66) To the extent the Court finds that information from the Flowers litigation is relevant to the issues in this case, the Court will take judicial notice of the docket sheet and pleadings from Case No. 1:08-CV-2376 pending in the United States District Court for the Northern District of Georgia.

[3]Plaintiff's Undisputed Fact #16 correctly states that the First Amended Complaint filed on August 8, 2008, is attached as Exhibit 3 to the Vance affidavit.  However, the Vance affidavit (doc #21) states in paragraph 14b that the Second Supplemental Complaint, filed on November 17, 2008, in the Flowers litigation, is attached as Exhibit 3.  However, a review of the documents attached to the Vance affidavit demonstrates that Exhibit 3 is the First Amended Complaint, rather than the Second Supplemental Complaint.

competition.  (PUF #18)

10.     Flowers alleges in the amended complaint that its "Nature's Own" phrase, as well as the accused phrases "Nature's Pride" and "Nature's Choice," were used in "advertising," "promotions" and "marketing" of the parties' respective bread products.  (PUF #19)

11.     IBC provided notice of the *Flowers* suit to OneBeacon on February 13, 2009, through the addressee requested in the policy, First Media.   IBC provided OneBeacon a copy of Flowers' August 8, 2008 amended complaint with the notice. [Vance Decl. ¶ 20] (PUF #28)

12.     By letter dated February 26, 2009, from First Media, a division of OneBeacon Professional Partners, OneBeacon denied IBC a defense and any insurance coverage for the *Flowers* suit. [Exhibit "13" (hereafter "OneBeacon Denial") and Vance Decl. ¶ 21; Exhibit "14" to RJN, p. 2]  (PUF #29)

13.     The denial described the OneBeacon policy as "a named perils professional liability" despite the absence of any such moniker in the "Advertiser's Advantage Policy" OneBeacon issued to IBC.  [OneBeacon Denial, p. 2]  (PUF #30)

14.     The denial letter stated that:

        In the **claim** in question, there are no allegations of any named perils arising from an **occurrence** in **advertising** or **scheduled advertising** as defined in and required by the Policy. ... From the information received to date, there are not any allegations that there has been actual **advertising** of the **insured's** products at issue.  The only causes of action against the **insured** are for marketing activities rather than from the content of **advertising** itself.  **Advertising** is a specialized component of marketing and can include types of media to be utilized, placement and frequency of advertisements and the actual advertisements themselves. ...  Notwithstanding allegations of marketing, we have no evidence **advertising** is at issue.

        [OneBeacon Denial, p. 2 (emphasis in original)]  (PUF #31)

15.     The denial also relies upon exclusion G for trademark infringement and H for certain deceptive trade practices to deny policy benefits. [OneBeacon Denial, p. 3]  (PUF #32)

16.     IBC first began to explore the idea of using the brand name "Nature's Pride" in connection with its products during the first calendar quarter of 2008.  (*See* Seban Dep. at 28:10–12, 29:22–30:15, attached as Exhibit 2)  (Defendant's Additional Facts #8 (hereafter "DAF")

17. During the Policy Term (*i.e.*, between September 1, 2007 and September 1, 2008) the only materials used by IBC which bore the "Nature's Pride" mark were the Trade Customer Brochures prepared by IBC which were shown to Wal-Mart, Kroger, Target and Safeway. (*See* Seban Dep. at 31:8–11, 31:23–32:7, 32:18–33:2, 33:25–34:4, 48:22–25, Exhibit 2 thereto and pages 14–27 of Exhibit 3 thereto, attached as Exhibit 2) (DAF #9)

18. The Trade Customer Brochures (which were stamped "confidential") were first presented to Wal-Mart, Kroger, Target and Safeway during private meetings with one or more representatives of each of the trade customers in an effort to provide them with information on a product line IBC planned to introduce as a replacement for an IBC product already on the shelves. (*See* Seban Dep. at 39:12–40:6, 48:16–21, 52:4–19, 53:5–11, 53:22–54:1, 56:15–57:10, 58:6–60:5, 61:11–16, 62:1–10, 66:8–14, 67:17–68:5, 103:5–104:23, attached as Exhibit 2) (DAF #10)

19. The private meetings during which IBC presented Wal-Mart, Kroger, Target and Safeway with the Trade Customer Brochures took place during April of 2008. (*See* Seban Dep.at 40:2–6, 53:5–11, attached as Exhibit 2) (DAF #11)

20. IBC's intention in providing the Trade Customer Brochures was to "gain [Wal-Mart's, Kroger's, Target's and Safeway's] support in replacing the brand that [IBC] had already had on the shelf. [IBC] needed their support in order to be able to properly market to consumers. (*See* Seban Dep. 31:24–32:4, attached as Exhibit 2) (DAF #12)

21. IBC contends it also prepared materials which contained the "Nature's Pride" mark to be given to non-national, regional customers by its sales force, but IBC cannot confirm that the promotional materials were, in fact, passed on to its non-national, regional customers. (*See* Seban Dep. at 31:5–35:13, 35:25–36:4, attached as Exhibit 2) (DAF #13)

22. IBC did not utilize the "Nature's Pride" mark in print media, including but not limited to magazine advertisements, disseminated to consumers during the Policy Term. (*See* Seban Dep. at 78:7–15, 113:24–114:2 attached as Exhibit 2) (DAF #14)

23. IBC did not utilize the "Nature's Pride" mark in broadcast media, including but not limited to television commercials, disseminated to consumers during the Policy Term. (*See* Seban Dep. at 79:20–80:1, attached as Exhibit 2) (DAF #15)

24. IBC did not utilize the "Nature's Pride" mark in any advertisements, regardless of format, disseminated to consumers until February of 2009. (*See* Seban Dep. at 71:22–72:20, attached as Exhibit 2) (DAF #16)

25. IBC's "Nature's Pride" bread products were not available for purchase by consumers

until February of 2009.  (*See* Seban Dep. at 36:20–22, attached as Exhibit 2)  (DAF #17)

26.     Storyboards reflecting ideas for potential television commercials referencing the "Nature's Pride" mark were generated in May, June or July of 2008, but the television commercials were never made and the storyboards were never shown to anyone other than IBC's employees and the advertising firm and research company hired by IBC to assist with creating and testing the storyboards.  (*See* Seban Dep. at 95:17–96:12, 96:20–97:5, 97:16–98:14, 113:17– 21, attached as Exhibit 2)  (DAF #18)

27.     IBC did not utilize the "Nature's Pride" mark in any outdoor advertisements during the Policy Term.  (*See* Seban Dep. at 114:3–5, attached as Exhibit 2)  (DAF #19)

28.     IBC did not utilize the "Nature's Pride" mark in any coupon advertisements during the Policy Term.  (*See* Seban Dep. at 114:6–21, attached as Exhibit 2)  (DAF #20)

29.     On or about September 3, 2008, roughly a month and a half after the *Flowers* Suit was filed on July 23, 2008, IBC's Senior Vice President, Chief Financial Officer, and Treasurer, J. Randall Vance, completed the Advertiser Advantage Policy Insurance Application which indicated that neither IBC nor any of IBC's subsidiaries had been involved in a lawsuit or claim in the previous five years arising from advertising activities.  (*See* Keating Aff., ¶ 17 and Attachment 5 thereto, attached as Exhibit 1) (DAF #32)

30.     On the September 3, 2008 Advertiser Advantage Policy Insurance Application, IBC disclosed to OneBeacon only four forms of advertising which it engaged in:  (1) television, (2) magazine; (3) coupons; and (4) online advertising which it described as "banner advertising, brand sites and promotional micro-sites."  No indication was made of IBC using brochures as advertising.  (*See* Keating Aff., ¶ 18 and Attachment 5 thereto, attached as Exhibit 1)  (DAF #33)

31.     IBC did not provide notice of the *Flowers* Suit to OneBeacon or request a defense until February 13, 2009, almost seven months after being sued in July 2008 and filing an Answer and Counterclaim in early September 2008.  (*See* Keating Aff., ¶ 16, attached as Exhibit 1)  (DAF #34)

32.     When IBC provided OneBeacon with notice of the *Flowers* Suit, it provided OneBeacon only a copy of Flowers' First Amended Complaint.  (*See* Keating Aff., ¶ 19, attached as Exhibit 1)  (DAF #35)

33.     A true and correct copy of the docket sheet in the *Flowers* litigation is attached as doc #51-2 to OneBeacon's Request for Judicial Notice.  (See doc #51)

34.     IBC responded to Interrogatory No. 10 in the *Flowers* litigation as follows:

> **(10) Attach for inspection and copying as Under Fed. R. Civ. P. 34 any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in this action or to indemnify or reimburse for payments to satisfy the judgment.**
>
> Defendant does not anticipate that any insurance policy will be called upon to satisfy a judgment, if any, entered in this case.

(Doc #64-1 at 7)

## IV.  DISCUSSION

A.      Positions of the Parties

IBC contends that:

> OneBeacon's policy lists eight elements required for coverage.  OneBeacon concedes in its denial letter that its policy requires a defense in any lawsuit where the allegations include:  (1) a claim (2) for loss (3) arising from an "occurrence" (4) committed by the insured (5) during the policy term (6) in or for certain "scheduled advertising" (7) with no applicable exclusions.  OneBeacon's list omits an eighth element for establishing coverage, namely, infringement of a "title" or slogan.

(Doc #20 at 20-21)  According to IBC, OneBeacon promises to defend any lawsuit with allegations meeting these elements even if the allegations  are "groundless, false or fraudulent."  (Doc #20 at 21)  IBC contends that OneBeacon has conceded coverage elements one, two, four and five and, thus, focuses its argument on the other coverage issues.  (Id.)

OneBeacon similarly agrees that the policy provides coverage for claims arising from an occurrence committed by IBC during the policy term in or for scheduled advertising, but adds the requirement "and arising from 'infringement of title,' 'infringement of slogan' or related unfair competition or Lanham Act claims.  (RSUF, ¶ 8.)"  (Doc #52 at 34)  Thus, OneBeacon contends that at the time it made its coverage decision, it rightfully denied coverage as the claims in the Flowers lawsuit do not arise out of or involve alleged infringement of title or slogan or related unfair

competition or Lanham Act claims. (Doc #52 at 35)

Defendant also contends that any potential for coverage is precluded by Exclusions E, G and H and the Omnibus Exclusionary Endorsement and that certain extrinsic information referred to by IBC was not reasonably ascertainable to defendant at the time of the coverage determination, but if considered, demonstrates that there was no scheduled advertising during the policy period. (Doc #52 at 37-39) Finally, OneBeacon contends that summary judgment is unavailable to plaintiff because of unresolved factual issues concerning the affirmative defenses of late notice and failure to cooperate. (Doc #52 at 39-42)

B.     Duty to Defend

The duty to defendant is a contractual obligation. In Missouri, it is well established that an insurance company has a duty to defend an insured when the insured is exposed to potential liability based upon facts known at the outset of the case, no matter how unlikely it is that the insured will be found liable. See Truck Ins. Exch. v. Prairie Framing, LLC, 162 S.W.3d 64, 79 (Mo. Ct. App. 2005); King v. Cont'l W. Ins. Co., 123 S.W.3d 259, 264 (Mo. Ct. App. 2003). The duty to defend is measured by comparing the language of the policy with the allegations of the plaintiff's complaint, even if the allegations are groundless. See Custom Hardware Eng'g & Consulting, Inc. v. Assurance Co. of Am., 295 S.W.3d 557, 561 (Mo. Ct. App. 2009). If the complaint alleges facts that give rise to a claim that is potentially within the policy's coverage, the insurer will have a duty to defend. See Columbia Mut. Ins. Co. v. Epstein, 239 S.W.3d 667, 670 (Mo. Ct. App. 2007). However, the insurer must also consider the complaint in light of facts it knew or could have reasonably ascertained. See Stark Liquidation Co. v. Florists' Mut. Ins. Co., 243 S.W.3d 385, 392 (Mo. Ct. App. 2007)(citing Truck Ins. Exch. v. Prairie Framing, LLC, 162 S.W.3d 64, 83 (Mo. Ct.

App. 2005)).  The presence of some insured claims in the underlying suit gives rise to a duty to

defend, even though uninsured claims or claims beyond the coverage are also alleged.  See Lampert

v. State Farm Fire & Cas. Co., 85 S.W.3d 90, 93 (Mo. Ct. App. 2002).  The insured bears the burden

of proving coverage while the insurer has the burden of proving an applicable exclusion.  See Essex

Ins. Co. v. Paric Corp., 2010 WL 2696709, *6 (E.D. Mo. July 6, 2010); Truck Ins. Exch., 162

S.W.3d at 80.

Both parties agree that a resolution of the issues requires a comparison of the policy language

with the allegations of the underlying litigation.

C.    Was There Scheduled Advertising?

OneBeacon contends that it had no duty to defend as there was no "scheduled advertising"

during the Policy Term.  This argument must be considered in the context of the policy language

which provides in part:

**SECTION I – COVERAGE AGREEMENTS[4]**

**A.    Advertising and Personal Injury Liability**

The **Company** shall pay on behalf of the **insured** all **loss** in excess of the
Retention and within the Limit of Liability which the **insured** is legally
required to pay to third parties because of liability imposed by law or
**assumed under contract** as a result of **claims** arising from an **occurrence**
committed by the **insured** during the **policy term** in or for **scheduled
advertising** and arising from:

\* \* \*

**SECTION II – DEFINITIONS**

---

[4]The policy at issue is attached to the Vance Affidavit as Exhibit 1.  (See Undisputed Fact
#4 (hereafter UF).  Unless otherwise noted, a word is highlighted in bold because it appears that
way in the Policy.  The Policy notes that words appearing in bold are defined in Section II.

When used in boldface in this policy including endorsements and the Declarations:

\* \* \*

**B.**    **Advertising** means **advertising**, publicity, press releases or promotion of the **insured's** services or products, but this definition does not include the redemption of lotteries, sweepstakes, contests or games of chance, including over or under redemption of any of the above.

\* \* \*

**M.**    **Occurrence** means:

    **1.**    the acquisition, creation and compilation of **matter** for **advertising;** and

    **2.**    the exhibition, dissemination or display of **advertising** through any medium.

\* \* \*

**Q.**    **Scheduled advertising** means the **insured's** products and services set forth in Item 2 of the Declarations[5] or by endorsement.

(Doc #21-1 at 3-5)

According to OneBeacon, the term "occurrence" is publicly focused using terms such as "exhibition," "dissemination," and "display" thereby making clear that the Policy is intended to cover public information available to consumers at large. (Doc #52 at 44) OneBeacon contends the same is true for the Policy's definition of advertising which again uses words such as "publicity," "press releases" and "promotion." (Id.)

However, according to OneBeacon, the facts demonstrate that no such advertising occurred during the term of the Policy. For example, IBC met with representatives of Wal-Mart, Kroger, Target and Safeway and provided them with Trade Customer Brochures which bore the "Nature's

---

[5]Item 2 of the Declarations provides: "**Scheduled Advertising:**  Advertising for the Insured's products." (Doc #21-1 at 2)

Pride" mark and which were marked "confidential." (Id. at 43; UF ##17-18) These materials were intended to provide existing customers with information about a product which IBC planned to introduce as a replacement for an existing IBC product. (UF ##18 and 20) OneBeacon characterizes this activity as a "precursor" to advertising or promotional efforts. (Doc #52 at 43) During the policy period, other than the Trade Customer Brochures, no television, magazine, coupon or outdoor advertisements bearing the "Nature's Pride" mark were disseminated and "Nature's Pride" products were not available for purchase until February of 2009, six months after the Policy term expired. (UF ##22-25 and 27-28)

In its reply suggestions, IBC points out that the testimony referenced by OneBeacon demonstrates that during the policy period, IBC was preparing: (1) storyboards for television commercials that were to advertise "Nature's Pride" bread; and (2) bread package logo designs for "Nature's Choice" and later "Nature's Pride" breads. According to IBC, "preparation" of advertising materials is fully consistent with the Policy's covered "occurrence" defined in part as the "creation and compilation of matter for advertising." (Doc #55 at 23; UF #26) IBC contends this is also consistent with the allegations in Paragraph 2 of the complaint in the Flowers litigation that IBC was "preparing to use" the "Nature's Pride" and "Nature's Choice" titles or slogans in advertising. (Doc #55 at 23)

It is significant to note that the definition of "occurrence" uses the term "and" rather than an "or." Neither party has addressed the significance of this language, but in the Court's view, the use of the conjunctive "and" means that before there is an occurrence within the meaning of the Policy there must be both "1. the acquisition, creation and compilation of matter for advertising; **and** 2. the exhibition, dissemination or display of advertising through any medium." (emphasis added)

Moreover, the term "advertising" relates to the advertising or promotion of the insured's "services or **products**" and "scheduled advertising" involves "advertising for the insured's **products.**" (emphasis added)  OneBeacon claims that during the policy period, not only was there no advertising, but there was no "product" for which there could be the "exhibition, dissemination or display of advertising."  There was merely a potential future product.  Pursuant to the language of the Policy, defendant's position that there was no scheduled advertising seems to be well taken.

However, this conclusion does not mean there is no duty to defend.  The <u>Flowers</u> lawsuit repeatedly alleges that IBC "<u>is using</u>, or preparing to use, or has stated an intent to use and otherwise promoted, the NATURE'S PRIDE AND NATURE'S CHOICE trademarks in connection with packaged breads." (Doc #21-3 at 3, ¶ 2)(emphasis added)  Similar language suggesting that IBC had actually used a mark similar to Nature's Own appears throughout the Amended Complaint.  (<u>See</u> doc #21-3 at ¶¶ 17, 24, 27, 28, 32 and 37)  The language that IBC was preparing to use a similar trademark was coupled in the Amended Complaint with the claim that IBC "has actually used" the Nature's Pride and Nature's Choice marks.  Evidence developed during discovery demonstrating that the Nature's Pride or Nature's Choice product did not exist and were not advertised during the policy period, while relevant to OneBeacon's ultimate liability for "loss," is not determinative of the duty to defend issue.

As noted, the language of the Amended Complaint in the <u>Flowers</u> litigation includes language that IBC is presently using and is promoting Nature's Pride and Nature's Choice.  Under Missouri law, even if the facts alleged in the complaint are untrue, there is still a duty to defend based upon those allegations.  Thus, OneBeacon's argument that there was no "occurrence" and no "scheduled advertising" during the policy period provides no basis for denying plaintiff's motion

for summary judgment.

However, section I of the Policy setting forth "Coverage Agreements" requires not only that the liability arise from an "occurrence" in or for "scheduled advertising," but the liability must also arise from one of seven covered categories. Thus, the Court must consider whether the allegations of the <u>Flowers</u> litigation falls within any of the categories listed in Section I of the Policy.

      D.     <u>Is There Coverage Under Section I.A. of the Policy?</u>

Section I.A. of the Policy sets forth the categories of claims covered and provides in part:

### SECTION I – COVERAGE AGREEMENTS

**A.     Advertising and Personal Injury Liability**

The **Company** shall pay on behalf of the **insured** all **loss** in excess of the Retention and within the Limit of Liability which the **insured** is legally required to pay to third parties because of liability imposed by law or **assumed under contract** as a result of **claims** arising from an **occurrence** committed by the **insured** during the **policy term** in or for **scheduled advertising** and arising from:

**1.**     defamation, however styled in a **claim**, involving disparagement or harm to the character, feelings or reputation of any person or organization, including libel, slander, product disparagement or trade libel;

\* \* \*

**4.**     infringement of copyright, **piracy**, plagiarism and misappropriation of ideas under implied contract;

**5.**     infringement of **title** or slogan;

**6.**     unfair competition and **claims** under Section 43(a) of the Lanham Act or similar state statutes, but only when alleged with the causes of action set forth under one or more of subparts 1, 4 or 5 above;

(Doc #21-1 at 3)

IBC claims that both infringement of title and slogan are implicated by the <u>Flowers</u> litigation.

14

1.    <u>Infringement of a Slogan</u>

IBC maintains that the failure of the <u>Flowers</u> complaint to allege infringement of a "slogan" and its use of the terms "trademark infringement" and "unfair competition" is not dispositive of the coverage issues in this case.[6]  (Doc #20 at 23)  Thus, IBC contends that the phrase "Nature's Own" is a slogan satisfying the policy requirement that liability arise from "infringement of ... slogan." (Doc #20 at 24)  In support of its argument that the factual allegations of the <u>Flowers</u> lawsuit trigger a duty to defend by OneBeacon, IBC relies on cases such as <u>Cincinnati Insurance Co. v. Zen Design Group, Ltd.</u>, 329 F.3d 546, 555 (6th Cir. 2003); <u>Ultra Coachbuilders, Inc. v. General Security Insurance Co.</u>, 2002 WL 31528474 at *3 (S.D.N.Y. July 15, 2002); and <u>Hudson Insurance Co. v. Colony Insurance Co.</u>, 624 F.3d 1264 (9th Cir. 2010).[7]  (Doc #20 at 23-24)  Accordingly, a comparison of those cases with the allegations and policy language of the OneBeacon policy is required.

IBC argues that in <u>Cincinnati Insurance Co. v. Zen Design Group, Ltd.</u>, 329 F.3d 546 (6th Cir. 2003), the Sixth Circuit found a duty to defend on the basis of slogan infringement in a case in which the causes of action asserted against the insured were virtually identical to those in the <u>Flowers</u> complaint, and the policy provided similar coverage.  (Doc #20 at 23)  In <u>Cincinnati Insurance Company v. Zen Design Group, Ltd.</u>, the insurance company filed a declaratory judgment

---

[6]IBC attempts to interpret the Flowers' litigation as alleging infringement of title or slogan in recognition that the policy provides no coverage for trademark claims.  Section III setting forth policy exclusions states that  The **Company** shall not be obligated to defend or to pay **loss** or **defense costs** arising from **claims:....** G. for or arising from infringement or dilution of trademark, trade name, trade dress, service mark or service name or unfair competition arising therefrom, but this exclusion shall not apply to **claims** for infringement of **title** or slogan.

[7]Initially, IBC relied upon the district court decision reported at 2008 WL 5504572 (C.D. Cal. Dec. 16, 2008).  This decision was affirmed by the Ninth Circuit on November 5, 2010.

action against Zen Design Group and its owner alleging it had no duty to defend in a suit brought against them by ASP alleging trademark and trade dress infringement. 329 F.3d at 547-48. ASP alleged in the underlying litigation that it marketed and advertised LED handheld flashlights using the widely recognized trademarks 'WEARABLE LIGHT" and "SAPPHIRE." Zen Design was also in the business of designing handheld LED lighting devices, including the StarlightTM flashlight. ASP alleged that Zen Design infringed on its trademarks by using the term "The Wearable Light" in its advertising. As in this case, ASP never referred to "WEARABLE LIGHT" as a slogan, rather it alleged that it owned a valuable trademark for this name. 329 F.3d at 554 n.4.

In refusing to defend, Cincinnati Insurance claimed that the phrase "The Wearable Light" was not a slogan, but just another name for LED lights. Relying on the Second Circuit's decision in Hugo Boss Fashions, Inc. v. Federal Insurance Co., 252 F.3d 608 (2nd Cir. 2001), Cincinnati Insurance argued there could be no slogan infringement if the phrase at issue is the house or product mark rather than a phrase used to promote the product. See Cincinnati Insurance Co., 329 F.3d at 554.

The policy issued by Cincinnati Insurance defined "advertising injury" to include injuries arising out of misappropriation of advertising ideas or infringement of copyright, title or slogan, but did not cover trade dress or trademark infringement claims. See Cincinnati Insurance Co., 329 F.3d at 549. The court first defined the term "slogan"[8] as a "distinctive cry, phrase, or motto of any party, group, manufacturer, or person; catchword or catch phrase." Id. at 556 (citing Random House Unabridged Dictionary 1800 (2d ed. 1993)). The court then examined the ASP advertisements from

_____

[8]As in this case, the policy at issue in Cincinnati Insurance Co. did not define the term "slogan." However, because the term "slogan" is easily defined by resort to common tools such as a dictionary, the court found that the term was not ambiguous. 329 F.3d at 556.

the underlying litigation. In the advertisements, the term "SAPPHIRE" followed by a registered trademark emblem appeared in large bold print above the picture of an LED flashlight. <u>Cincinnati Insurance Co.</u>, 329 F.3d at 556. Beneath the word "SAPPHIRE," in smaller letters and without a registered trademark emblem was the phrase "The Wearable Light." <u>Id.</u> The court found that "SAPPHIRE" appeared to be the name of the product while "The Wearable Light" could be construed to be the catchword or catch phrase used to promote the product. <u>Id.</u> Thus, ASP's assertion of ownership over the phrase "The Wearable Light" together with Zen Design's alleged used of the same phrase in connection with its LED flashlights were arguably allegations of slogan infringement. <u>Id.</u> at 557.

The <u>Flowers</u> lawsuit sets forth in detail the efforts undertaken to register "Nature's Own" as a trademark.[9] Thus, "Nature's Own" is the trademark that is equivalent to the trademark "SAPPHIRE" in the <u>Cincinnati Insurance Co.</u> case; it is the name of the mark or the product. However, in this case, unlike in <u>Cincinnati Insurance Co.</u>, there is no allegation that there is an accompanying slogan such as "The Wearable Light" which was infringed.

In another case relied upon by IBC, <u>Ultra Coachbuilders, Inc. v. General Security Insurance Co.</u>, 2002 WL 31528474 (S.D.N.Y. July 15, 2002), whether insurance coverage existed again depended upon whether the facts alleged in the underlying complaint could support a claim of slogan infringement.[10] In that complaint, Ford Motor Company sued Ultra Coachbuilders alleging federal

---

[9]The allegations of the Amended Complaint also refer to the defendants using "confusingly similar imitations of the federally registered NATURE'S OWN Mark" and trading on the "goodwill associated with Flowers' federally registered marks." (Doc #21-3 at 10, ¶¶ 28-29)

[10]The policy in <u>Ultra Coachbuilders</u> excluded coverage for advertising injury arising out of infringement of a trademark, service mark, or trade name, other than titles or slogans. 2002

and common law trademark infringement. 2002 WL 31528474 at *1. Ultra Coachbuilder's business was converting Ford automobiles into stretch limousines. Id. Quality Vehicle Modifier ("QVM") was the name of a program created by Ford in response to National Highway Safety concerns about vehicles that were converted into stretch limousines. Id. Certification under the program allowed a converter to sell stretched Ford vehicles with Ford's registered trademarks intact. Id. Ford's lawsuit alleged that Ultra Coachbuilder's use of a similar abbreviation, VQM, in connection with advertising and selling of Ford vehicles infringed on the QVM mark and was confusing. Id. Ultra Coachbuilder was not certified under the QVM program, but allegedly sold the converted limousines with the Ford marks still in place. Id.

Ultra Coachbuilders sued General Security Insurance Company ("General Security") alleging that General Security breached its duty of defense when it refused to defend Ultra Coachbuilders in the suit brought by Ford. The policy issued by General Security covered claims alleging infringement of a slogan, but excluded coverage for all trademark infringement claims. Ultra Coachbuilders, Inc., 2002 WL 31528474 at *1. The court set forth the definition of slogans used by both the Second Circuit in Hugo Boss Fashions, Inc. v. Federal Insurance Company, 252 F.3d 608, 618 (2nd Cir. 2001), and the California Supreme Court in Palmer v. Truck Insurance Exchange, 988 P.2d 568, 576 (Cal. 1999), concluding that under either definition there was a reasonable possibility that the descriptive phrase "Quality Vehicle Modifier" was a slogan. Ultra Coachbuilders, Inc., 2002 WL 31528474 at *3. The court found that the phrase was used to promote both the program and products, i.e. Ford vehicles that had been converted to limousines. Thus, the reasonable possibility that "Quality Vehicle Modifier" or "QVM" would qualify as a slogan was

WL 31528474 at *2.

sufficient to give rise to the duty to defend the claims brought against Ultra Coachbuilders by Ford. Id. at *2.

The Ninth Circuit in Hudson Insurance Co. v. Colony Insurance Co., 624 F.3d 1264 (9th Cir. 2010), also found a duty to defend affirming the district court's ruling that the complaint brought against the insured potentially stated a cause of action for slogan infringement covered by the insurance policy. The litigation in Hudson over insurance coverage originated as a result of a lawsuit filed by NFL Properties against All Authentic for allegedly selling counterfeit National Football League jerseys. All Authentic tendered the defense of the action to two different insurers – Hudson Insurance Company and Colony Insurance Company (Hudson and Colony). Hudson[11] defended, but Colony refused a defense claiming its policy did not cover the allegations of the underlying lawsuit filed by NFL Properties. The Colony insurance policy covered personal and advertising injury, but excluded coverage as to personal and advertising injury arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. However, the exclusion did not "apply to infringement, in your 'advertisement,' of copyright, trade dress or slogan." 624 F.3d at 1266.

Hudson filed suit seeking contribution from Colony for the cost of defense. The underlying lawsuit filed by NFL Properties did not allege slogan infringement,[12] however, paragraph 18 of the complaint alleged that:

---

[11]The Hudson policy covered advertising injury including infringement of copyright, title or slogan and did not contain a trademark exclusion. 624 F.3d at 1266 n.1.

[12]The lawsuit filed by NFL Properties stated causes of action for trademark infringement under federal and New York law, federal and New York trademark dilution, unfair competition and deceptive acts and practices. See Hudson Ins. Co. v. Colony Ins. Co., No. ED CV 07-01497 SGL (OPx), doc #27-2 (C.D. Cal. filed May 20, 2008).

Exhibit B displays an image of a Counterfeit Jersey offered for sale on www.allauthentic.com as a "Steel Curtain Custom Limited Edition Steelers Jersey" on the left, next to an authentic NFL Uniform Design Jersey on the right. The Counterfeit Jersey reads "Steel Curtain" across the back and bears the numbers of four Pittsburgh Steelers players using the same style of numbering and lettering as appears on the authentic Pittsburgh Steelers' NFL Uniform Design Jerseys. The Steelers have strong common law rights in the mark "Steel Curtain" and own a state registration for the mark "Steel Curtain ... Pittsburgh Steelers." The Counterfeit Jersey features the same black and gold color combination and striping as the official Pittsburgh Steelers' NFL Uniform Design Jerseys.

Hudson Ins. Co. v. Colony Ins. Co., No. ED CV 07-01497 SGL (OPx), doc #27-2 at 9 (C.D. Cal. filed May 20, 2008).[13] The appellate court agreed with the district court's analysis of the effect of paragraph 18 of the complaint and, citing the district court opinion, held:

> As the district court noted, "A fair reading of the [NFL complaint] reveals that 'Steel Curtain' is used to promote fan loyalty to the Steelers (an NFL Member Club) in general, and a subset of Steeler players in particular." The district court concluded that this potentially stated a claim for slogan infringement because a "slogan" is a "brief attention-getting phrase used in advertising or promotion." (Quoting Palmer v. Truck Ins. Exch., 21 Cal.4th 1109, 90 Cal.Rptr.2d 647, 988 P.2d 568, 576 (1999) (defining "slogan" under California law)). In Gunderson neither the legal theory of property damage nor facts supporting the legal theory of property damage were alleged, but here, the NFL complaint alleges facts potentially supporting a legal theory of slogan infringement.

Hudson Ins. Co. v. Colony Ins. Co., 624 F.3d 1264, 1268 (9th Cir. 2010).

OneBeacon contends that if the term "slogan" is defined as suggested by IBC as a "brief attention-getting phrase used in advertising or promotion," then under this definition, "Nature's Own" does not qualify as a slogan. (Doc #52 at 35) In support of this position, defendant relies on the Second Circuit's decision in Hugo Boss Fashions, Inc. v. Federal Insurance Co., 252 F.3d 608

---

[13]The district court opinion did not set forth all sections of the complaint on which the opinion was based, but instead referred to the underlying complaint attached as Exhibit 2 to the filing in the case. See Hudson Ins. Co. v. Colony Ins. Co., 2008 WL 5504572, *1 n.1 (C.D. Cal. Dec. 16, 2008). That complaint is available on the website for the United States District Court for the Central District of California.

(2nd Cir. 2001). <u>Hugo Boss</u> involved insurance coverage issues arising out of Federal Insurance Company's refusal to indemnify and pay the defense costs in a suit brought against several Hugo Boss companies by the Boss Manufacturing Company (BMC). <u>Id.</u> at 610. BMC alleged that Hugo Boss's use of the term "BOSS" on certain products constituted trademark infringement and breach of contract.[14] <u>Id.</u>

The policy at issue in the <u>Hugo Boss</u> case contained an intellectual property exclusion stating that it did not apply to advertising injury arising out of conduct which is claimed as an infringement of copyright, patent, trade dress, trade secrets, or trademark or service mark or certification mark or collection mark or trade name, other than trademarked or service marked titles or slogans. <u>Id.</u> at 612. The Second Circuit found that the failure to define the term "slogan" did not render the insurance policy ambiguous because federal case law indicate that "trademarked slogans" are phrases used to promote or advertise a house mark or product mark, in contradistinction to the house or product mark itself.[15] <u>Id.</u> at 618. In considering whether the term "BOSS" could be considered a slogan, the Second Circuit held:

> It would be odd indeed to say that the trademarked name of a brand, product, or
> company constitutes a "trademarked slogan" merely because it "remind[s] the

---

[14]Hugo Boss USA is a group of subsidiaries of Hugo Boss Germany which is a designer and manufacturer of expensive men's clothing and accessories. BMC manufactures industrial and outdoor clothing and accessories such as shoes, boots, garden gloves and mittens. Both BMC and Hugo Boss sell items bearing the term "BOSS." <u>See</u> <u>Hugo Boss</u>, 252 F.3d at 611. In 1990, the parties entered into an agreement whereby Hugo Boss Germany agreed not to sell or license others to sell gloves, mittens or boots with a mark that incorporated the word "BOSS." <u>Id.</u>

[15]As used in the opinion, house mark refers to a company name or line of products and the term product mark refers to the name of a particular product. To illustrate the concept, the court noted that Ford or Kellogg's could be considered a house mark and Mustang or Pop Tarts a product mark. <u>See</u> <u>Hugo Boss</u>, 252 F.3d at 618 n.7.

consumer of the brand." For under this definition, all house, product, or brand names would qualify as slogans. Thus, it seems clear that a "slogan" must be something, other than the house mark or product mark itself, that provides such a reminder.

Id. at 619.

The Second Circuit referred to many other cases in which it was assumed, even if not explicitly stated, that a trademarked slogan is a word or phrase used to promote house or product names, but is not the house or product name itself:

> Thus, in Nike, Inc. v. "Just Did It" Enterprises, 6 F.3d 1225, 1229 (7th Cir.1993), the Seventh Circuit noted that "Nike asserts JUST DO IT is its slogan, not the name of the business to which customers make checks payable in order to receive Nike products." And, in American Express Co. v. CFK, Inc., 947 F. Supp. 310, 312 (E.D. Mich.1996), a district court said that "American Express developed an advertising campaign which featured the slogan, 'DON'T LEAVE HOME WITHOUT US.' According to the Company, this slogan was intended to encourage the public to use their [products] while traveling on business and pleasure." See also Cont'l Scale Corp. v. Weight Watchers Int'l, Inc., 517 F.2d 1378, 1379-80 (C.C.P.A. 1975)(noting that "[i]n connection with its 'HEALTH-O-METER' bath scales, petitioner ... has continuously used the slogan 'America's Weight Watcher Since 1919'").

Hugo Boss, 252 F.3d at 619.

On this basis, the Second Circuit concluded that by disclaiming coverage for trademark infringement, the policy at issue "must be read to exclude from coverage any injury caused by an infringing use of the term 'BOSS' alone." Id. at 620. Further, the court interpreted the carve-out for trademarked slogans as applying only to words or phrases used to promote particular products or product lines. Thus, "BOSS" the house name did not qualify as a slogan. Id.

During oral argument, counsel for IBC argued that the decision in Hugo Boss was "completely antithetical to the approach that Missouri has followed as evidenced by McCormack Baron." (Doc #69 at 22-23) However, in McCormack Baron Management Services, Inc. v. American Guarantee and Liability Insurance Co., 989 S.W.2d 168 (Mo. banc 1999), the issue was

whether the CGL policy that covered injury arising out of one or more of the following offenses –

including oral or written publication of material that disparages a person's or organization's good,

products or services – covered any cause of action involving disparaging comments or only the

cause of action of disparagement (now referred to an injurious falsehood).

Contrary to the argument presented by IBC, the holding in <u>McCormack Baron</u>, that the word

"offense" cannot be read to limit coverage to a particular cause of action or claim, does not dictate

a different definition of the term "slogan" from that adopted by the Second Circuit in <u>Hugo Boss</u>.

Moreover, there is nothing in the <u>Cincinnati Insurance Co. v. Zen Design Group, Ltd.</u> opinion that

contradicts the conclusion in <u>Hugo Boss</u> that a slogan is normally not the name of the product or the

product line. In <u>Cincinnati Insurance Co.</u>, the court was careful to point out that the name of the

product was "SAPPHIRE" and that "The Wearable Light" was the "catch word or catch phrase"

used by the manufacturer to promote its product. <u>See</u> <u>Cincinnati Insurance Co. v. Zen Design</u>

<u>Group, Ltd.</u>, 329 F.3d 546, 556 (6th Cir. 2003).

Renaming the trademark infringement and unfair competition claims pled in the <u>Flowers</u>

litigation "slogan infringement" in an effort to afford policy coverage would render the policy

exclusion for claims of trademark infringement meaningless. Under IBC's theory, any claim

involving the alleged misuse of a trademarked name would be covered by the policy as a potential

cause of action for slogan infringement. Such an interpretation is contrary to the plain language of

the policy and standard rules of contract interpretation. Thus, the Court concludes that, in the

circumstances of this case, the rationale of <u>Hugo Boss</u> is persuasive and allegations that IBC's

conduct infringed on the product mark "Nature's Own" cannot be read as alleging infringement of

a slogan.

## 2. Title Infringement

IBC also contends that the allegations that IBC infringed the "Nature's Own" mark satisfy the policy requirement of liability arising from "infringement of title." (Doc #20 at 27-28) Unlike the term "slogan," the policy defines the term "title" as "the caption or name of matter." (Doc #21-1 at 5) Matter is defined by the policy as "any communication, regardless of its nature or form, including but not limited to **advertising**, art, creative expression, data, entertainment, film, facts, fiction, graphics, literary composition, music, news, photographs, pictures, opinions, sound recordings and video, and the use of such **matter** by others with the permission of the **insured.** (Doc #21-1 at 5) Thus, IBC argues that the allegations of the Flowers lawsuit allege infringement of title for the following reasons:

> ... The "Nature's Own" and the accused "Nature's Pride" "titles" are communicated to the public solely in the form of advertising because the words are not part of the loaf of bread itself. [SUF ¶ 17 (Flowers' Supplemental Complaint ¶¶ 2, 7 (parties market and sell "packaged" breads)]

> The complaint asserts that Flowers "markets" its breads "under the Nature's Own trademark." [SUF ¶ 17 (Flowers' Supplemental Complaint ¶ 9)] The reasonable inference is that its marketing materials are designated and captioned with the phrase (or named) "Nature's Own." Since "markets" is a synonym for "promotes," the complaint also alleges that the claimant's promotional materials are captioned "Nature's Own," meeting the policy definition of a "title."

> Other Flowers suit allegations confirm "Nature's Own" may also be a "title" because it is used as a name or caption of a communication. Flowers alleges that it uses its "Nature's Own" mark "as an indicator of the source of goods provided by, licensed by, or otherwise affiliated with Flowers." [SUF ¶ 17 (Flowers' Supplemental Complaint ¶ 16)] In other words, the phrase communicates to consumers that Flowers sponsors a particular bakery product by labeling the packaging and other promotional materials "Nature's Own." Nature's Own is the name or caption of the communication, meeting the policy's definition of "title."

(Doc #20 at 28)(footnote omitted)

Using the policy definitions, OneBeacon contends that the issue is whether "Nature's Own"

24

is the name or caption of a communication. (Doc #52 at 37) For example, defendant argues that a typical title would be the name of a book or artwork and that "Nature's Own" is the brand name of a product, not the name of a communication. OneBeacon point to the fact that "Nature's Own" is identified as the product name on its trademark applications and that there is no mention of any advertising campaign by this name. (Doc #52 at 37)

IBC argues that the "majority of jurisdictions agree that a 'title' can be trademarked and must be broadly construed to include the name of a product, business, service and related trademarks – not just literary works," citing <u>Acuity v. Bagadia</u>, 750 N.W.2d 817, 826 (Wis. 2008), and <u>Northern Virginia Funeral Choices, Inc. v. Erie Insurance Co.</u>, 2003 WL 1960687 (Va. Cir. Ct. Mar. 21, 2003). (Doc #20 at 29 and Doc #69 at 25) However, in the cited cases, the policy language was considerably different than the language before the Court in this case.

In <u>Acuity v. Bagadia</u>, 750 N.W.2d 817, 823 (Wis. 2008), the policy at issue provided coverage for advertising injuries and defined advertising injuries as an injury stemming from, among other things, "[m]isappropriation of advertising ideas or style of doing business; or [i]nfringement of copyright, title or slogan." In that litigation, Symantec, the owner of copyrights and trademarks in products such as Norton AntiVirus, Norton Utilities, Norton SystemsWorks and Norton Clean Sweep, sued UNIK Associates, a business involved in purchasing computer software at discounted prices and reselling the software. Symantec alleged that UNIK Associates violated Symantec's copyrights and trademarks by selling Symantec products without authorization. <u>Id.</u> at 821-22. While this lawsuit was ongoing, Acuity, the insurer of UNIK Associates, filed a lawsuit and a summary judgment motion seeking a declaration that it had no duty to defend UNIK Associates. <u>Id.</u> The district court denied the summary judgment motion and ordered Acuity to defend the action

brought against UNIK Associates. Subsequently, the trial court also ordered Acuity to indemnify UNIK Associates for the judgment entered against it in the lawsuit filed by Symantec. <u>Id.</u> at 821-22. The Wisconsin Court of Appeals affirmed the trial court's rulings holding that Acuity's insurance policy with UNIK Associates covered Symantec's judgment with respect to both its copyright and trademark infringement claims. <u>Id.</u> at 822. The issues were then appealed to the Wisconsin Supreme Court.

The policy at issue in <u>Acuity</u> did not mention the term "trademark infringement"[16] and did not define the term "title." Because the term "title" was not defined, the court gave the term its plain, ordinary meaning as set forth in the dictionary. <u>Id.</u> at 824. "Title" was defined by various dictionaries as a "distinguishing name" or a "descriptive or distinctive appellation." <u>Id.</u> The Wisconsin Supreme Court observed that dictionaries used similar words to describe the terms "title" and "trademark." The dictionary defined "title" as a distinctive appellation and "trademark" as a distinctive mark. Thus, in a policy that lacks a definition of the term "title" and fails to exclude coverage for "trademark infringement," the court held that the policy's coverage of "infringement of title" was broad enough to encompass trademark infringement. <u>Id.</u> at 827.

Similar policy issues were raised in the other case relied on by IBC, <u>Northern Virginia Funeral Choices, Inc. v. Erie Insurance Co.</u>, 2003 WL 1960687 (Va. Cir. Ct. Mar. 21, 2003). In that case, Old Town Funeral Choices (Old Town) filed suit against Mr. Harman and Northern Virginia Funeral Choices, Inc. (Northern Virginia) requesting injunctive relief and damages for alleged trademark infringement and common law unfair competition. 2003 WL 1960687 at *1. The suit

---

[16]Symantec argued that trademark infringement was enumerated as an advertising injury under the policy provisions covering infringement of title or misappropriation of advertising ideas or style of doing business. <u>Id.</u> at 824.

alleged that Mr. Harman formed a business which competed with Old Town and which incorporated the "funeral choices" label originated by the owners of Old Town.  Id.  The injury alleged in the underlying case was one for service mark or trademark infringement regarding the use of the term "funeral choices."  Id. at *2.

Northern Virginia  made a demand on its insurer, Erie Insurance Company (Erie), to defend and indemnify the litigation filed by Old Town, which Erie rejected.  Northern Virginia eventually filed suit seeking to recover the cost of defense and the amount of the judgment.  Id. at *1.  The court framed the issue as whether service mark or trademark infringement constituted an "advertising injury."  The policy defined "advertising injury" as including injury arising out of "misappropriation of advertising ideas or style of doing business" or "infringement of copyright, title or slogan."  Id. at *2.  Erie's position was that trademark and trade dress infringement were such common and distinct categories of actionable conduct that had the insurer intended to provide coverage for such liability,  the insurer would have referred to it by name.  Id.  In rejecting the line of cases relied upon by Erie, the court suggested several bases for its conclusion that the claims were covered.  First, the court concluded that the terms "infringement of copyright, title or slogan" were broad enough to encompass a claim of trademark infringement.  As an alternative basis for its decision, the court concluded that the policy's failure to mention the term "trademark infringement," was an ambiguity which had to be interpreted against  the insurer.  Finally, the court concluded its decision could be supported because one's mark and name are an integral part of an entity's style of doing business.  Thus, "infringement of trademark" is a misappropriation of the style of doing business, a category of conduct for which the policy explicitly provided coverage.  Id. at *2-3.

In another decision recently submitted to the Court, CGS Industries, Inc. v. The Charter Oak

27

Fire Insurance Co., 2010 WL 4720320 (E.D.N.Y. Nov. 16, 2010), the issue was whether Charter Oak had a duty to defend CGS Industries, Inc. (CGSI) in a lawsuit brought by Five Four for trade dress and trademark infringement. To fall within the coverage of the Web Xtend Policy issued by Charter Oak for advertising injury, the injury must have arisen out of infringement of copyright, title or slogan. Id. at *4. As in other cases relied upon by IBC, the policy issued by Charter Oak did not define the term "title." Id. Relying on other cases where the term "title" was defined by the courts, Judge Weinstein in CGS Industries also concluded that "title" could include claims of trademark infringement. Id. Not only was infringement of title potentially implicated by the allegations of the underlying litigation, but the court noted that the policy provisions covering slogan infringement also required that Charter Oak defend CGSI, at least until it was determined the policy did not provide coverage. Id. at *5. The court distinguished the case before it from Hugo Boss noting that the Five Four marks were not solely product names as in Hugo Boss. Rather, the Five Four marks include symbols and styles that, according to the Five Four complaint, "embody the spirit of modern culture." Id. The court found that these "symbols" may constitute "slogans." Id.

Unlike the policies at issue in Acuity, Northern Virginia, and CGS Industries, the policy at issue in this case specifically excluded coverage for "infringement or dilution of trademark, trade name, trade dress, service mark or service name or unfair competition arising therefrom ..." While coverage for "infringement of title" was part of the coverage agreement in Section I, the policy specifically defined the term "title." Thus, the rationale of cases interpreting policies with entirely different provisions provides no support for IBC's argument that contrary to the specific policy terms and definitions, the term infringement of "title" should be interpreted to mean "infringement of a trademark."

### 3. IBC Has Acknowledged There is No Covered Claim in the Flowers Lawsuit

OneBeacon points out that IBC recognized and admitted that there was no coverage and hence no duty to defend in the _Flowers_ litigation when it submitted its Advertiser Advantage Policy Insurance Application in September of 2008.  (_See_ doc #52-1 at 18-22)  At that time, IBC was asked about claim information including the following:

### 5. Insurance History and Claim Information

Does the Applicant know of any situation that could give rise to a claim?

> If "yes," please attach complete details and advise whether the claim has been reported.

Has the Applicant or any subsidiary been involved in a lawsuit or claim in the past five years arising from advertising activities?

> If "yes," please attach claim information including the amount of defense costs, judgment or settlement.  If the claim has not yet been resolved, please provide the amounts for which the claim has been reserved.

Provide details in an attachment regarding any open claims or litigation resulting from advertising activities occurring more than five years ago.

(Doc #52-1 at 20-21)  J. Randall Vance, Senior Vice-President, CFO and Treasurer answered "no" to each of these questions.  (_Id._)  Thereby indicating that neither IBC nor any of its subsidiaries had been involved in a lawsuit in the last five years arising from advertising activities.  However, at the time these answers were filed, the _Flowers_ litigation had been pending for a month and a half.  (UF #29)[17]

---

[17]The docket sheet in the _Flowers_ litigation, doc #51-2, does not reflect when IBC was served with the complaint.  However, by August 14, 2008, counsel for Flowers Bakeries Brands, Inc. and IBC had jointly agreed that plaintiff could file an amended complaint and that defendant could have until September 2, 2008 in which to answer or otherwise respond.  (_See_ docket entry #7, doc #51-2 at 4)

IBC responds that answers provided in a subsequent policy application cannot exonerate OneBeacon's duty to defend under a policy in effect prior to the alleged non-disclosures. While the Court agrees that these subsequent statements cannot void the earlier policy, their significance is that this is evidence, that at that time, IBC did not believe the <u>Flowers</u> litigation was a claim arising from "advertising activities" within the meaning of the policy. While this admission alone is not determinative of the issues before the Court, it provides further support for this Court's interpretation of the policy language when compared to the allegations of the <u>Flowers</u> litigation. Significantly, IBC did not respond to this argument, further supporting OneBeacon's position that in September of 2008, even IBC recognized that there had been no lawsuit or claim made against IBC as a result of its advertising. (<u>See</u> discussion, doc #52 at 46-47)

E.      Does an Exclusion Preclude Coverage?

OneBeacon also contends that even if the Court concludes that the policy provides coverage for the claims in the <u>Flowers</u> suit, IBC's motion for partial summary judgment should be denied as any potential for coverage under the Policy is precluded by Exclusions E, G and H, as well as the Omnibus Exclusionary Endorsement. (Doc #52 at 37) Section III of the policy provides in part:

## SECTION III – EXCLUSIONS

The **Company** shall not be obligated to defend or to pay **loss** or **defense costs** arising from **claims:**

* * *

E.      for or arising out of actual or alleged false or misleading **advertising** or for unfair competition arising therefrom;

* * *

G.      for or arising from infringement or dilution of trademark, trade name, trade dress, service mark or service name or unfair competition arising therefrom,

but this exclusion shall not apply to **claims** for infringement of **title** or slogan;

**H.** for or arising out of actual or alleged violation of a statute, regulation or common law that prohibits antitrust activities, deceptive trade practices, price fixing, price discrimination, monopolization, restraint of trade or any unfair competition or conspiracy relating to any of these causes of action;

(doc #21-1 at 6)

A comparison of the language of the policy exclusions with the allegations of the <u>Flowers</u> complaint highlights the applicability of the exclusions. The First Amended Complaint sets forth causes of action for federal trademark infringement (Count I); federal unfair competition (Count II); state trademark dilution (Count III); common law and state unfair competition (Count IV); and unfair and deceptive trade practices (Count V).[18] Not only do the labels of these claims place them squarely within the policy exclusions, but the allegations further support the conclusion that the claims are excluded from coverage. The First Amended Complaint in <u>Flowers</u> repeatedly states that IBC's use of the Nature's Pride mark constitutes unfair competition and deceptive trade practices. For example, the allegations include claims that IBC's "conduct is likely to cause confusion, deception, and mistake by creating the false and misleading impression that [IBC's] unlicensed and unauthorized goods are manufactured or distributed by Flowers;"[19] "[IBC's] actions demonstrate an intentional, willful, and malicious intent to trade on the goodwill associated with Flowers' federally registered marks to Flowers' great and irreparable injury;"[20] "[IBC] has made false representations, false descriptions, and false designations of origin of its goods and services in violation of 15 U.S.C.

---

[18]The First Amended Complaint erroneously labels this claim Count VI.

[19](doc #21-3 at ¶ 27)

[20](doc #21-3 at ¶ 29)

§ 1125(a);"[21] and "[IBC's] conduct is likely to dilute the distinctive quality of the NATURE'S OWN Mark."[22]

IBC claims that Exclusion E, the exclusion for false or misleading advertising or unfair competition arising therefrom, does not apply "because Flowers does not allege that 'Nature's Pride' or 'Nature's Choice' state untruths about IBC's bread." (Doc #20 at 30) Exclusion E applies not only to "alleged false or misleading **advertising**," but also to claims for "unfair competition arising therefrom" Count II of the Amended Complaint, titled Federal Unfair Competition, alleges that:

> 32.   The actions complained of herein have caused and are likely to cause confusion, deception, and mistake by creating the false and misleading impression that [IBC's] goods are affiliated, connected or associated with Flowers, or have the sponsorship, endorsement, or approval of Flowers.

> 33.   [IBC] has made false representations, false descriptions, and false designations of origin of its goods and services in violation of 15 U.S.C. § 1125(a), and [IBC's] activities have caused, and unless enjoined by this Court, will continue to cause a likelihood of confusion and deception of members of the trade and public and, additionally, injury to Flowers' goodwill and reputation as symbolized by the NATURE'S OWN Mark to Flowers' great and irreparable injury.

(Doc #21-3 at 10-11) As part of the common law and state unfair competition claims, the <u>Flowers</u> Amended Complaint alleges that "[IBC's] conduct demonstrates a bad faith, intentional, and willful intent to mislead, deceive, and confuse the public." (Doc #21-3 at ¶ 42) The conduct referred to is IBC's use or promotion of NATURE'S PRIDE and NATURE'S CHOICE trademarks to promote bakery goods as described throughout the Amended Complaint. (<u>See</u> <u>e.g.</u>, doc #21-3 at ¶ 17 ) Thus, these claims would appear to fall directly within the exclusion E.

However, IBC goes on to argue that even if Exclusion E applies, OneBeacon owes a defense

---

[21](doc #21-3 at ¶ 33)

[22](doc #21-3 at ¶ 37)

because there is wrongdoing alleged besides the "unfair competition" and Missouri law requires OneBeacon to defend the entire lawsuit where potentially covered and non-covered claims are joined. (Doc #20 at 30) However, this argument assumes that coverage exists under a theory of slogan or title infringement. For the reasons discussed above, the Court has rejected IBC's position with respect to coverage under Section I.A.5. for infringement of slogan or title.[23]

Likewise, by its very terms, section III.G., the exclusion for claims arising from infringement or dilution of trademark, trade name or trade dress or unfair competition arising therefrom, precludes coverage for the claims at issue in the Flowers litigation.

Finally, IBC contends that Exclusion H does not preclude coverage for the Flowers unfair competition and deceptive trade practices claims because if it did, "then coverage purportedly provided by the OneBeacon policy would no longer be ambiguous. It would be a sham and illusory." (Doc #20 at 31) IBC also alleges that section H pertains to antitrust activities and that the Flowers Amended Complaint does not allege any anti-trust activities. (Doc #20 at 31)

IBC's arguments ignore the precise language of Exclusion H and the coverage provisions of Section I.A.6. While Exclusion H excludes coverage for claims arising out of actual or alleged violations of statutes, regulations or common law that prohibit antitrust activities and price fixing, it also excludes claims arising out of deceptive trade practices and unfair competition relating to claims of deceptive trade practices. The Court agrees that the Flowers litigation does not involve antitrust allegations, but deceptive trade practices are clearly alleged:

---

[23]A rejection of the argument that there is no claim for infringement of title or slogan under section I.A.5. also means that there is no coverage for the allegations of the Flowers Amended Complaint under section I.A.6. which covers claims of unfair competition when alleged with the causes of action set forth in one or more subparts, including subpart I.A.5.

25.      [IBC] has long been aware of the fame of the NATURE'S OWN Mark and is willfully and intentionally using the NATURE'S PRIDE and/or NATURE'S CHOICE marks to cause confusion among consumers and retailers and to trade upon the commercial magnetism and good will of the NATURE'S OWN Mark.

* * *

45.      [IBC's] conduct is causing a likelihood of confusion or of misunderstanding as to the source, sponsorship, or approval of [IBC's] goods, causing a likelihood of confusion as to [IBC's] affiliation, connection, or association with another, and otherwise damaging the public.  [IBC's] conduct constitutes unfair and deceptive acts or practices in the course of a business, trade or commerce in violation of O.C.G.A. §§ 10-1-370 to 10-1-375 and similar statutes of other States.

(Doc #21-3)  Other courts have held similar allegations are sufficient to state a claim under Georgia law for unfair competition and deceptive trade practices.  See e.g., U.S. Pharmaceutical Corp. v. Breckenridge Pharmaceutical, Inc., 2010 WL 3731112, *7 (N.D. Ga. Sept. 16, 2010).

The fact that there is no coverage and hence no duty to defend the unfair competition claims raised in the  Flowers litigation does not render the policy coverage a "sham" or "illusory."  The coverage purchased covers claims of unfair competition and claims under Section 43(a) of the Lanham Act or similar state statutes, but only when alleged with causes of action for defamation, infringement of copyright, piracy, plagiarism and misappropriation of ideas or infringement of title or slogan.  The allegations brought in the Flowers litigation  are not within the coverage provisions, but fall squarely within the policy exclusions.[24]

## V.  CONCLUSION

For the reasons outlined above, it is

ORDERED that the Motion by Plaintiff Hostess Brands, Inc., fka Interstate Bakeries

---

[24]OneBeacon raised a number of other issues which it argued prevented the Court from granting IBC's motion for partial summary judgment.  Given the Court's ruling, it is not necessary to address these issues.

Corporation for Partial Summary Judgment Re Duty of Defense (doc #19) is denied.  It is further

ORDERED that Defendant OneBeacon Insurance Company's Request for Judicial Notice (doc #51) and Defendant OneBeacon Insurance Company's Second Request for Judicial Notice (doc #64) are granted to the extent the Court finds that information from the <u>Flowers</u> litigation is relevant to the issues in this case.

_____/s/ Sarah W. Hays_____
SARAH W. HAYS
UNITED STATES MAGISTRATE JUDGE
